Approved: _____
NOAH FALK
Assistant U.S. Attorney

Before:   THE HONORABLE KATHARINE H. PARKER
          United States Magistrate Judge
          Southern District of New York

**16 MAG 7879**

- - - - - - - - - - - - - - - - x

                                      **SEALED COMPLAINT**
UNITED STATES OF AMERICA        :     Violation of 18 U.S.C.
                                      §§ 2315 & 2.
            - v. -              :
                                      COUNTY OF OFFENSE:
LEON ZINDER,                    :     NEW YORK

            Defendant.         :

- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        CHRISTOPHER McKEOGH, being duly sworn, deposes and says
that he is a Special Agent with the Federal Bureau of
Investigation ("FBI"), and charges as follows:

### COUNT ONE
### (Interstate Sale of Stolen Property)

        1.    From in or about at least September 2015 through in or
about at least November 2016, in the Southern District of New York
and elsewhere, LEON ZINDER, the defendant, received, possessed,
concealed, stored, bartered, sold, and disposed of goods, wares,
and merchandise, securities, and money of the value of $5,000 and
more, which had crossed a State or United States boundary after
being stolen, unlawfully converted, and taken, knowing the same to
have been stolen, unlawfully converted, and taken, to wit, ZINDER
attempted to sell and did sell artworks he transported to a flea
market in New York, New York, that he had previously stolen from
his former employer's facility in Greenwich, Connecticut.

        (Title 18, United States Code, Sections 2315 & 2.)



The bases for my knowledge and for the foregoing charge are, in part, as follows:

2.    I am a Special Agent with the FBI.  I have been a Special Agent for approximately 13 years.  I have been assigned to the Major Theft squad since 2014.  In connection with my assignment to the Major Theft Squad, I specialize in investigations concerning art theft and art fraud, and have participated in other investigations concerning financial crimes, mail fraud, wire fraud, and money laundering.

3.    I make this Affidavit in part on personal knowledge based on my participation in the investigation and conversations with other FBI Special Agents, and other law enforcement officers; conversations with witnesses and victims of the offenses described herein; reviews of reports and other documents prepared by agents and others.

4.    Throughout this Affidavit, where I assert that a statement was made, I was not the individual to whom the statement was made unless I specifically so state.  Rather, information about the statement was provided by the specified law-enforcement officer or other individual (who may have had either direct or indirect knowledge of the statement) to whom I have spoken or whose reports I have read and reviewed.  Such statements are among many statements made by others and they are set forth in substance and in part, unless otherwise indicated.

5.    Furthermore, the facts and circumstances of this investigation have been summarized for the specific purposes of this Application.  I have not attempted to set forth the complete factual history of this investigation or all of its details.  In making this application, I rely only on the facts stated herein.

### Relevant Entities and the Defendant

6.    At all times relevant to this Complaint, the "Company" was a New York-based limited liability company founded in order to maintain, and ultimately to liquidate, the art collection of a deceased art collector (the "Collector").  This collection (the "Collection") consisted of thousands of individual pieces, including an extensive collection of Native-American and African ethnographic artworks.

7.    At all times relevant to this Complaint, the Company has maintained offices, storage facilities, and galleries in,

among other places, Purchase, New York (the "Purchase
Facility"), Port Chester, New York (the "Port Chester Facility")
and Greenwich, Connecticut (the "Greenwich Facility").

      8.    From in or about July 2010 through in or about April
2012, LEON ZINDER, the defendant, was employed by the Company as
an art handler whose responsibilities included moving items from
the Collection between the Company's facilities, including
between the Purchase Facility and the Greenwich Facility.

### Items Stolen from the Company

      9.    I have interviewed Company personnel, including an
executive of the Company (the "Executive"), from whom I have
learned the following information:

      a.    After the Collector's death in 2006, the Company
sought to determine the value of its collection.  Among other
items, the Company had the following items appraised: a Fang
Reliquary Guardian Head statue (the "Fang Statue"), a Pende mask
measuring 10 x 8 x 7.5 inches ("Mask-1"), and a Native-American
mask measuring 8 x 6 x 5 inches ("Mask-2").

      b.    The Greenwich Facility was the last known
location for all three of these items.

      c.    In or about August 2013, Company personnel became
aware that a number of items were missing from the Company's
collection and filed a police report to that effect with the
Harrison, New York Police Department on or about August 19, 2013
(the "Police Report").

      d.    Mask-1 and Mask-2 were not listed in the Police
Report, but Company personnel later became aware that Mask-1 and
Mask-2 were also missing, as detailed further below.

      10.    I have reviewed documentation provided by the Company
indicating that, as of December 2006, the Fang Statue had an
estimated value of $85,000; Mask-1 had an estimated value of
$2,500, and Mask-2 had an estimated value of $75,000.

      11.    I have reviewed the Police Report, which listed 10
items reported stolen from the Company, with a combined
estimated value in excess of $929,000.  The Fang Statue was
listed in the Police Report.

3

**Sale and Attempted Sale of Items Stolen from the Company**

### *The Fang Statue*

12.   I have interviewed a New York City-based art dealer who has been cooperating with the Government's investigation (the "Dealer"), and whose information has been corroborated and has proven to be reliable.  Based on interviews with the Dealer, I have learned the following information:

a.   In or about September 2015, LEON ZINDER, the defendant, met the Dealer at an outdoor flea market in Manhattan where the Dealer was selling artworks.  During that encounter, ZINDER purchased a costume from the Dealer.  Shortly thereafter, ZINDER offered to sell the Fang Statue to the Dealer.   In response to the Dealer's inquiries about the Fang Statue's provenance, ZINDER stated that he had purchased the Fang Statue, among other items, as part of a storage unit close-out sale.

b.   ZINDER ultimately furnished the Dealer with documentation that ZINDER stated had also come from the storage unit, some of which was written in German, and which appeared to consist principally of personal letters.

c.   ZINDER agreed to sell the Fang Statue to the Dealer for approximately $20,000.  Because ZINDER would only accept cash payment, the Dealer paid ZINDER in cash installments over several months in exchange for the Fang Statue.

d.   Subsequently, through in or about October 2016, ZINDER provided the Dealer with between approximately 10 and 15 additional items, which ZINDER and the Dealer agreed would be sold on consignment by the Dealer, and for which the Dealer would receive a commission of 25% of the purchase price.

e.   In or about September 2016, the Dealer learned that certain items provided to the Dealer by ZINDER had been reported stolen by the Company to the Art Loss Register database, at which time, the Dealer contacted the FBI and began assisting in the FBI's investigation.

13.   At my direction, the Dealer subsequently provided the Fang Statue to me.

14.   The Executive was subsequently shown the Fang Statue by FBI Investigators, and the Executive confirmed that the Fang Statue belonged to the Company, that the Fang Statue was missing

4

from the Collection, and that its last known location was the
Greenwich Facility.

### *Mask-1*

15.   I have learned the following information from my
interviews of the Dealer concerning the consignment of Mask-1 by
LEON ZINDER, the defendant:

a.   In or about May 2016, ZINDER provided the Dealer
with two Native-American masks, one of which was later
identified as Mask-1.   ZINDER instructed the Dealer to sell the
masks for $3,000 each.

16.   I have reviewed numerous text message exchanges
provided by the Dealer between the Dealer and ZINDER, from which
I learned the following:

a.   On or about June 3, 2016, at 10:58 p.m. GMT, the
Dealer wrote a text message to ZINDER stating, among other
things, that "I was told Hopi mask is over priced and illegal to
sell in US," to which ZINDER replied at 11:09 p.m. GMT, "you
mean the two Hopi masks?  Ok hold them back."  In a subsequent
message later that day, ZINDER stated, "or if someone wants to
offer also fine if reasonable."

17.   I know from my involvement in this investigation that
the Dealer did not sell Mask-1.   At my direction the Dealer
subsequently turned over Mask-1 to me.

18.   I have learned from my interviews with the Dealer
that, based on the Dealer's experience in the ethnographic art
market, the Dealer believes that Mask-1 currently has a market
value in excess of $5,000.

19.   The Executive was subsequently shown Mask-1 by FBI
Investigators, and the Executive confirmed that Mask-1 belonged
to the Company, that Mask-1 was missing from the Collection, and
that its last known location was the Greenwich Facility.

### *Mask-2*

20.   I have learned from interviews with the Dealer the
following information concerning the consignment of Mask-2 by
LEON ZINDER, the defendant:

5

a.    In or about October 2016, LEON ZINDER, the defendant, met with the Dealer at the outdoor flea market in Manhattan where the Dealer conducted his business.   ZINDER provided the Dealer with two Native-American masks, including a mask later identified as Mask-2, and instructed the Dealer to sell the items consistent with their consignment arrangement. ZINDER stated that the Dealer should price Mask-2 at $70,000 and the second mask at $30,000.

b.    The Dealer asked ZINDER about the provenance of the masks.   ZINDER stated that he got the masks, including Mask-2, from a lady in Arizona who wanted to sell them.   ZINDER further stated that the lady was elderly and wanted to get rid of her belongings, and did not want anyone to know what she was doing.   The Dealer pressed ZINDER for the name of the lady, but ZINDER did not provide it.

21.   I know from my involvement in this investigation that on or about November 22, 2016, the Dealer arranged a meeting between LEON ZINDER, the defendant, and an FBI agent working in an undercover capacity (the "UC"), posing as the agent of an art collector interested in purchasing, among other items, Mask-2. The UC recorded the conversation of the UC's meeting with ZINDER, at which the Dealer was also present.   From my review of that recording, I have learned the following:

a.    The UC expressed interest in buying Mask-2 and the other mask, in addition to other items that ZINDER might have available for sale.

b.    With respect to Mask-2, ZINDER stated that the price was $70,000.   With respect to the other mask, ZINDER stated that the price was $30,000, but that if the UC bought both items, ZINDER would be open to lowering the price of the second mask to $20,000 or $22,000.

c.    ZINDER stated that he got the Native-American pieces, including Mask-2, from an elderly woman in Phoenix, Arizona, the widow of a sheriff, who had an eclectic collection and who did not want to part with it, but whom ZINDER had convinced to sell these items.

d.    ZINDER also stated that he had a partner on the West Coast who was under some time pressure to complete this sale.

e.   ZINDER provided the UC with his telephone number, the same number reflected in the text message exchanges between ZINDER and the Dealer described above in Paragraph 16.

22.   I know from my involvement in this investigation that the Dealer did not sell Mask-2, and subsequently provided Mask-2 to me, at my direction.

23.   The Executive was subsequently shown Mask-2 by FBI Investigators, and the Executive confirmed that Mask-2 belonged to the Company, that Mask-2 was missing from the Collection, and that its last known location was the Greenwich Facility.

### Additional Items Stolen from the Company

24.   I have learned from interviews with the Dealer, that between in or about September 2015 and in or about October 2016, in addition to the Fang Statue, Mask-1, and Mask-2, ZINDER provided the Dealer with at least 10 other items on consignment, which items ZINDER instructed the Dealer to sell.   In each instance, the Dealer either provided the FBI with the item itself, or provided the FBI with a photograph and description of the item, and information regarding the item's possible whereabouts.

25.   With respect to these additional items identified by the Dealer, the Executive has confirmed that all of the items are missing from the Company, and has provided dimension and valuation information for each item as follows:

a.   Songye Community Power Figure, 29 x 10 x 12 inches, valued at $300,000 as of December 2006;

b.   Songye Wood Power Figure, 26.5 x 7.5 x 7.5 inches, valued at $150,000 as of December 2006;

c.   Eskimo Polychrome Mask, 10 x 10 x 2 inches, valued at $30,000 as of December 2006;

d.   Mask, 10 x 8 x 3 inches, valued at $17,500 as of December 2006;

e.   Dogon Wood Power Figure, 16 x 3.5 x 3 inches, valued at $10,000 as of December 2006;

f.   Hopi Mask, 8.5 x 5.5 x 8 inches, valued at $2,500 as of December 2006;

7

g.    Dan Bird Mask, 11 x 6 x 5.5 inches, valued at $8,500 as of December 2006;

h.    Chokwe Style Mask, 9 x 5.75 x 4 inches, valued at $400 as of December 2006;

i.    Kachina Doll, 12.5 x 4.5 x 3.5 inches, valued at $3,000 as of December 2006;

j.    Songye Power Figure, 4 x 1.5 x 1.5 inches, valued at $4,000 as of December 2006.

26.    I know from my interview with the Executive that, according to the Company's records, the items described above were likely not stored at the Connecticut Facility.

WHEREFORE, I respectfully request that LEON ZINDER, the defendant, be arrested, and imprisoned or bailed, as the case may be.

_____
CHRISTOPHER McKEOGH
Special Agent
Federal Bureau of Investigation

Sworn to before me this
_8_ day of December, 2016

_____
HON. KATHARINE H. PARKER
United States Magistrate Judge
Southern District of New York